[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION ON DEFENDANT'S MOTION FOR JUDGMENT NOTWITHSTANDING THE VERDICT
Facts
By complaint dated December 13, 1995, served upon the defendant on December 14, 1995, the plaintiffs, Laurence Scanlon and Louise Scanlon ("Scanlons"), sued the Connecticut Light and Power Company ("CLP") for damages allegedly sustained as the result of the defendant's negligence in allowing stray voltage from CLP's equipment to be released onto the Scanlons' farm. The case was tried to ajury. By verdict returned on February 8, 2000, the jury awarded the Scanlons $601,000 in economic damages and $300,000 in noneconomic damages.
Judgment entered in accordance with the jury's verdict and CLP appealed. The Connecticut Supreme Court reversed the judgment as to the jury's award of noneconomic damages because the trial court failed to give a particular charge to the jury that had been requested by CLP. The case was remanded for a new trial limited to the Scanlons' claim of negligent infliction of emotional distress.[1]
On remand, the case was again tried to a jury. At the conclusion of the plaintiffs' evidence, CLP moved for a directed verdict and the court reserved decision. On June 28, 2002, the jury returned a verdict in favor of the Scanlons in the amount of $200,000 for the emotional distress suffered as the result of CLP's negligence. By motion dated July 3, 2002, CLP moved that the jury verdict be set aside and that judgment be ordered in its favor in accordance with its motion for a directed verdict.[2] A hearing on this motion was held on July 30, 2002.
In support of its claim, CLP argues that the Scanlons' cause of action is barred by the statute of limitations, Section 52-584 of the General Statutes; that the Scanlons failed to prove facts sufficient to satisfy the foreseeability test set forth in Montinieri v. Southern New EnglandCT Page 13075Telephone Company, 175 Conn. 337 (1978); and that the decision inMontinieri, supra, should be "reversed and abandoned" because a claim for negligent infliction of emotional distress should require pleading and proof that the emotional distress caused physical illness or bodily harm. Because the court concludes that the statute of limitations bars the plaintiffs' claim of negligent infliction of emotional distress, it is not necessary to address the other grounds raised by CLP in support of its motion.
Discussion
"The trial court possesses inherent power to set aside a jury verdict which, in the court's opinion, is against the law or the evidence." (Internal quotation marks omitted.) American National Fire Insurance Co.v. Schuss, 221 Conn. 768, 774, 607 A.2d 418 (1992); Palomba v. Gray,208 Conn. 21, 23-24, 543 A.2d 1331 (1998); Tolbert v. ConnecticutGeneral Life Insurance Co., 58 Conn. App. 694, 698, 755 A.2d 293 (2000). In ruling on CLP's motion with respect to the statute of limitations claim, this court is required to make a legal rather than a factual determination.
Section 52-584 of the Connecticut General Statutes provides as follows:
 Sec. 52-584. Limitation of action for injury to person or property. No action to recover damages for injury to the person, or to real or personal property, caused by negligence, or by reckless or wanton misconduct, or by malpractice of a physician, surgeon, dentist, podiatrist, chiropractor, hospital or sanatorium. shall be brought but within two years from the date when the injury is First sustained or discovered or in the exercise of reasonable care should have been discovered, and except that no such action may be brought more than three years from the date of the act or omission complained of, except that a counterclaim may be interposed in any such action any time before the pleadings in such action are finally closed.
Section 52-584 is the appropriate statute of limitations to apply when the claim is the negligent infliction of emotional distress. Rivera v.Double A Transportation, Inc., 248 Conn. 21, 31, 727 A.2d 204 (1999). Section 52-584 "requires that the injured party bring suit within two years of discovering the injury. . . . In this context injury occurs when a party suffers some form of `actionable harm'. . . . A breach of duty by the defendant and a causal connection between the defendant's breach of CT Page 13076 duty and the resulting harm to the plaintiff are essential elements of a cause of action in negligence. . . . They are therefore necessary ingredients for `actionable harm.'" (Citations omitted; internal quotation marks omitted.) Catz v. Rubenstein, 201 Conn. 39, 43-44,513 A.2d 98 (1986). "In Connecticut, a cause of action accrues when a plaintiff suffers actionable harm. (Citation omitted.) Actionable harmoccurs when the plaintiff discovers or should discover, through theexercise of reasonable care, that he or she has been injured and that thedefendant's conduct caused such injury." Champagne v.Raybestos-Manhattan, Inc., 212 Conn. 509, 521, 562 A.2d 1100 (1989). Emphasis supplied.
The Scanlons' claimed injury is the emotional distress they suffered as the result of CLP's negligence as set forth in the complaint dated June 24, 2002, as follows:
 5. From 1983 through December, 1992, the plaintiffs were unable to determine the cause of their livestock's bizarre behavior, chronic ailments and decreased milk production and the result of the same on the financial condition of the farm which resulted in financial losses.
 6. Prior to 1983 through December, 1992, the defendant knew or should have known of the existence of stray voltage in Connecticut and its potential adverse effects on the business of operating a dairy farm.
 7. The defendant, Connecticut Light Power Company should have realized that its conduct involved an unreasonable risk of causing emotional distress and that the distress, if it were caused, might result in illness or bodily harm.
 8. The defendant's negligent conduct as previously determined, caused the plaintiffs to suffer serious emotional distress. Plaintiffs' emotional distress arose out of the unexplained failure of their dairy farm which resulted in a severe strain on their marriage.
A fair reading of the operative complaint indicates the emotional distress was caused by the unexplained problems with the dairy operation at their farm. Although paragraph 3 of the amended complaint alleges CLP was responsible for releasing stray voltage onto the Scanlon farm from CT Page 13077 approximately 1983 through 1994, paragraphs 5 and 6 indicate that the cause of the problems with their livestock remained unexplained until December of 1992. The plaintiffs' action was filed and served in December of 1995. The issue, then, is whether the Scanlons, prior to December 14, 1993, discovered, or should have discovered through the exercise of reasonable care, that they had suffered emotional distress and that CLP's negligence in allowing stray voltage to adversely affect their dairy farm caused that emotional distress. The court concludes the Scanlons' cause of action accrued in December of 1992. Because this lawsuit was commenced more than two years from that point in time, Section 52-584 bars their claim for negligent infliction of emotional distress.
The Scanlons, in their brief in opposition to this motion, claim there is no prima facie evidence of when the statute of limitations period began to run. They contend that no evidence was produced to indicate when the Scanlons knew that CLP was negligently delivering stray voltage at levels harmful to their livestock. It was apparent from the testimony at trial, however, that the Scanlons began experiencing emotional distress sometime in 1983, and that the cause of that distress was the unexplained failure of their business despite their best efforts. They had a successful dairy farm and healthy herd prior to 1983. After that time, the conditions deteriorated and they began to blame each other for the problems on the farm. In December of 1992, at a dairy seminar meeting attended by Mr. Scanlon, it was suggested that perhaps stray voltage was adversely affecting their herd. Mr. Scanlon arranged to have a non-CLP employee test for stray voltage and, upon getting a positive result, he called CLP the next morning.[3] When the presence of stray voltage on the Scanlon farm was confirmed by CLP's testing, the cause and source of their problems were identified.
Mr. Scanlon's testimony on June 25, 2002 indicates:
 Q When did you first learn that Connecticut Light Power believed that there was stray voltage on your property?
 A When they came out in a hurry to fix it at the end of 1992.
Pages 37-38.
* * *
Q We're going to talk about that in a second, but CT Page 13078 during that time that you felt you were fixed and you saw this improvement what did that do for your relationship and for your marriage?
 A Well, the minute we knew that the problem was not of our making and it was from outside the farm and beyond our control then the whole blame game stopped and it was, you know, it wasn't Louise's fault, it wasn't my fault.
 Q At some point did you come to realize that the fix that you thought you had wasn't going to be permanent?
 A Well, we knew that there was a problem with the fix and that it needed to be corrected. We did not know that the correction would result in further injury to the cows.
 Q All right. At some point after what we've been calling the fix, which was approximately what, December 1992?
A Correct.
Page 92.
* * *
 Q Mr. Scanlon, when the farm was fixed temporarily in 1992 and you guys had an answer how old was Larry the third?
A Twenty-two.
 Q And up to that point when you got your first answer what had been the overall impact that your business problems had on the Scanlon family?
A Well, as we said earlier Louise had left and filed for divorce and taken the kids with her and ultimately came back and did not pursue the divorce, but Larry didn't — did not come back. And I guess ROLL could say that he blamed me for all the problems. CT Page 13079
MS. NASTRI: Objection, your Honor.
THE COURT: Sustained.
BY MR. IANNACCONE:
 Q We were talking about the effect on family with all the problems you had with the business. How has that affected you?
 A Well, you — to a certain extent you feel like you're a failure because you haven't provided well or you've got turmoil in your family that you're at least partially responsible for. You think you haven't provided a good environment to some extent, you may not have provided some of the things your family would like, like a vacation, you know, and travel or whatever, you know, that you're being criticized within the community. You have pressure on you because you know this is taking place, but you have no idea what to do about it.
 Q And how did getting the answers finally affect what you've just described as the impact on you?
 A Well, it removed the burden because we — at least I knew now that the problems on the farm were not of our making. In other words, Louise and I were not responsible for it, so now it became a matter of getting the people who were responsible for it to fix it so we could move on with our lives.
Pages 102-103.
* * *
 Q Your complaint said from 1983 to 1992 you and Mrs. Scanlon were unable to determine the cause for the livestocks bizarre behavior as you described it earlier, and in 1992 you learned, in fact, it was stray voltage from CLP, correct?
A Yes.
Q And that alleviated some stress on your marriage, didn't it? CT Page 13080
A Yes.
 Q Made things better because you both knew that you guys weren't doing anything wrong, right?
 A Well, it alleviated stress in the short run because that was not the final fix.
Page 107.
 The testimony of Mrs. Scanlon at trial[4] supports the conclusion that the plaintiffs believed the problems remained unexplained until December of 1992.
 Q Regarding any of those things that you have control over or even that you don't have control over, today when a problem arises how do you address it?
 A If I find a sick cow, I either treat the cow if I know what's wrong with her or I call the vet and the vet comes. And nowadays without the stray voltage on the farm we don't have any problems. We don't have the kinds of problems, so it's a little bit different. If there's a problem with a piece of equipment today, it may be something Larry can fix, maybe he can't. You call a mechanic, you get it fixed. If the milking equipment breaks down, you call the landfill dairy equipment, usually they respond within the hour. It never breaks down when you're not milking. It usually breaks down when you're milking.
If you're having some sort of herd health problem or production problem, you go through sort of a list of a checklist of things to look at to try to determine what that is, and when you've made the determination you make an adjustment and you say I see a change, the nutritionist will say: Well, this feed is low in energy so we're going to change the component in the grain to rise the energy level, and they should be back to where they were last week or yesterday or whatever. Sometimes those problems are frustrating, but you can identify the problem and identify the cause and take some steps to fix it. CT Page 13081
 Q All right. Now, did that — were you able to do that between 1983 and 1992?
A No.
Pages 34-35.
* * *
Q Prior to 1992 what had been solution that worked?
A Nothing.
Q How did you feel about that?
 A It went from puzzled to frustration to angry. We ultimately got angry with each other even though in hindsight it made no sense. It was just finally — just went to despair like you just throw up your hands and say we did this so well last year or the year before or the year before when we didn't even know what we were doing. We did this well, how could this happen.
Page 47.
* * *
 Q Through your discussions with Mr. Stand love — and I know you met him at a educational meeting — did you learn that maybe stray voltage was the problem or the cause for all of this stuff on the farm?
 A Well, I wasn't present at that initial — I wasn't there, but my understanding was that Dr. Standlove said that stray voltage can cause problems for cows, but I don't know if this level is a problem or not.
 Q And then once you had talked to Dr. Standlove did someone subsequently call CLP and —
A Larry called CLP. CT Page 13082
Q And they came out the next day?
A I believe it was the next day.
 Q Is it correct to say that the greatest cure for the stress that you and Mr. Scanlon had been experiencing from "83 to "92 was finding out what was causing the trouble on the farm?
A The greatest cure was having it resolved.
 Q Okay. Do you recall testifying at the earlier trial in this matter that the greatest cure for the stress on your marriage was finding out what was causing the trouble on the farm?
 A I don't remember those exact words, but finding out what the cause was a good thing because then we could go to a solution.
 Q Would you agree that is the greatest cure that is finding out the cause?
 A Greatest cure, yeah, I think so. It put us on the same side of the issue, I believe.
Q You had someone else you could blame, right?
A You bet.
Pages 75-76.
* * *
 Q So back to my question: The cause for the emotional distress in your life, the cause for the stress on your marriage was the unexplained problems on your farm, the lack of an answer to your question on what was going on with your herd; isn't that right?
A I think so; yeah.
Q Okay. Now, is it correct to say that once the problem with stray voltage was addressed in December of 1992, it was like a load was off your shoulders? CT Page 13083
A For 90 days it was great.
 Q And at that time you knew and Mr. Scanlon knew that neither one of you was the enemy, that there was something else going on, right?
A Right.
Q And that was a great feeling, wasn't it?
A It was.
Pages 77-78.
* * *
 Q And "93 you're referencing the time after you learned that stray voltage was an issue on the farm, right?
A Yes.
Page 97.
When the tests performed by CLP in December of 1992 indicated the presence of stray voltage on the Scanlon farm, the cause of their problems was determined. The Scanlons may not have known the extent of the damage caused by the stray voltage or whether CLP was responsible for all of their losses, but their testimony at trial clearly indicates they believed in December of 1992 that CLP caused stray voltage to be present on their farm and that the stray voltage from CLP was adversely affecting their livestock. The Scanlons claim the negligent infliction of emotional distress was not the loss of their farm ammals for which they received economic damages but could not receive non-economic damages. See e.g., Coston v. Reardon, 30 CLR 611 (2001), Hixon v. Eilers, 29 CLR 254
(2001), Jason v. Rotz, ___ CLR ___, CV98-0351648S, Judicial District of Fairfield. Rather, it was the stress on their marriage caused by unexplained losses to their herds for which each blamed the other.
The cause of action accrued when the Scanlons identified the cause of their problems with the dairy herd, i.e., the stray voltage, and the source of the stray voltage, i.e., CLP. The emotional distress, as alleged in their complaint and their testimony at trial, was caused by the unexplained problems on their farm. Even though a precise correlation CT Page 13084 between the amount of stray voltage and harm to the dairy herd had not been fully established at that time, their cause of action nevertheless accrued in December of 1992. "[A]n injury occurs when a party suffers some form of actionable harm. The harm need not have reached its fullest manifestation before the statute begins to run." Burns v. HartfordHospital, 192 Conn. 451, 460, 472 A.2d 1257 (1984).
A superior court decision, Rivera v. Fairbank Management Properties,Inc., 45 Conn. Sup. 154, 703 A.2d 808 (1997), addresses issues similar to those in this case. Ms. Rivera sought damages for injuries allegedly sustained by her minor daughter as a result of exposure to lead-based paint while residing at an apartment owned by the defendant. The plaintiff first learned her daughter had high levels of lead in her blood between October and November of 1993. In February of 1994, she was told there were high levels of lead in the apartment. The plaintiff brought suit in April of 1996. The defendant moved for summary judgment, claiming Section 52-584 barred the plaintiffs action. The court concluded as follows:
 Applying the rule of Catz and Champagne, the common law cause of action would accrue when the plaintiff discovered that Nathalie had suffered some harm and that the defendant's allegedly negligent conduct had caused it. Thus, the two crucial dates are the date when the plaintiff knew Nathalie had suffered some physical injury as a result of lead exposure and the date she knew that lead was on the premises. Both these dates are undisputed; the former being between October and November, 1993, and the latter being sometime in February, 1994. Thus, the common law cause of action accrued no later than February, 1994.
Although the plaintiff claims that the defendant engaged in additional acts and omissions after the accrual date which may have aggravated Nathalie's injury, these claims, even if proven, are irrelevant to fixing the point in time for accrual of the cause of action. . . . The identity of the cause of action remains essentially the same, however, arising out of the defendant's creation, maintenance and concealment of a hazardous lead condition. "A change in, or an addition to, a ground of negligence or an act of negligence arising out of the single group of facts which was originally claimed to have brought about the unlawful injury to the plaintiff does not change the cause of action." Gallo v. G. Fox Co., CT Page 13085 148 Conn. 327, 330, 170 A.2d 724 (1961).
The statute begins to run when the plaintiff discovers some form of actionable harm, not the greatest amount of harm. "The harm need not have reached its fullest manifestation before the statute begins to run." Burns v. Hartford Hospital, 192 Conn. 451, 460, 472 A.2d 1257
(1984).
Id., 162-163.
In the present case, the Scanlons discovered in December of 1992 that their emotional distress was caused by the negligence of CLP in allowing stray voltage to be present on their farm and they believed at that time that their livestock had been adversely affected by CLP's negligence. As in Rivera, the fact that the Scanlons claim CLP representatives made the problems worse with the initial fix in 1992 and that the Scanlons suffered additional harm because of CLP's actions does not change the fact that the actionable harm for statute of limitations purposes occurred in December of 1992. Their suit, therefore, would have had to have been commenced no later than December of 1994 in order to be timely filed. Their suit was served on CLP on December 14, 1995 and, for that reason, is time-barred by Section 52-584 of the General Statutes.
The Scanlons also claim that CLP waived the statute of limitations by its conduct. The court is not persuaded by this argument. In its initial answer and special defenses, dated October 4, 1996, CLP asserted the statute of limitations as a defense. In an amended answer and special defenses dated May 8, 2002, CLP asserts as its second special defense that "[t]his action is time-barred by the statute of limitations, Conn. Gen. Stat. Sec. 52-584." CLP represented at the trial that it was relying upon the same answer and special defenses in response to the plaintiffs' operative complaint, dated June 24, 2002, amended at the trial. At no time did CLP ever file an answer without asserting the statute of limitations special defense.
The Scanlons maintain that, by failing to request a charge from the original trial court on the statute of limitations claim, CLP is now precluded from raising it at the second trial. No case law is cited to support this position. The only cases cited by the Scanlons are those involving the general principle of waiver by conduct, and none of those cases are factually similar to the case at bar. The court concludes that CLP did not waive the statute of limitations defense by its conduct.[5]
Conclusion
CT Page 13086
The plaintiffs' action is barred by the statute of limitations, Section52-584 of the General Statutes, because it was not filed within two years of the occurrence of the Scanlons' actionable harm.
Pursuant to Section 16-37 of the Practice Book, the court grants CLP's motion to set aside the jury's verdict in favor of the Scanlons and enters judgment for CLP.
BY THE COURT
McLachlan, J.